IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 15-00293 SOM-KSC-2 |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING IN PART AND** |
| | ) | **DENYING IN PART DEFENDANT'S** |
| vs. | ) | **MOTION TO SUPPRESS STATEMENTS** |
| | ) | **BASED ON THE FOURTH AND FIFTH** |
| MICHAEL WALKER (02), | ) | **AMENDMENTS** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO
SUPPRESS STATEMENTS BASED ON THE FOURTH AND FIFTH AMENDMENTS**

**I.      INTRODUCTION.**

Defendant Michael Walker is accused of having arranged
for his girlfriend, Ailsa Jackson, to kill his wife in their
home on a military reservation, while he was working the night
shift at an Army hospital.

Before the court is a motion to suppress Walker's
statements based on the Fourth and Fifth Amendments and *Miranda
v. Arizona*, 384 U.S. 436 (1966).  *See* Defendant's Motion to
Suppress, ECF No. 147.

Because the Government has demonstrated by a
preponderance of the evidence that Walker was not detained for
Fourth Amendment purposes and not subject to custodial
interrogation for Fifth Amendment purposes until Agent Mitchell
asked him about his extramarital relationships, the motion to
suppress statements made before those questions is denied.  That

1

is, Walker's statements before the subject of extramarital relationships was raised at line 22 of page 49 of the transcript of the interview on November 15, 2014, are not suppressed.

The motion to suppress is granted in all other respects. Specifically, the Government may not use Walker's statements after Agent Mitchell's question appearing at line 22 of page 49 of the transcript in its case in chief. This ruling excludes from trial only slightly more interview statements than the Government has itself conceded that it will not use in its case in chief in light of law enforcement's violation of *Miranda*. Nor may the Government use Walker's statements beginning at line 25 of page 49 of the transcript for impeachment purposes. The court suppresses these statements as involuntary. Similarly suppressed and not usable at trial for any purpose, including impeachment, are Walker's handwritten note and statements relating to the note.

## II.     FINDINGS OF FACT.

This court received oral testimony from Emily Partridge, Thomas Sides, Jr., Charles Baker, Ian Mitchell, and Mark Pezel during a hearing on July 28, 2017. The court finds all of them credible. The court also has before it all exhibits that were attached to the moving and opposing papers, which this court received in evidence for purposes of the present motion. The court heard argument on July 28 and 31, 2017.

In an effort to rule promptly on the merits and to avoid the burden on the court's over-extended court reporters, and because Walker's motion to suppress was heard shortly before the trial date, the court did not request and therefore does not have final transcripts of the live testimony, although the court has "rough" unedited copies of those transcripts. Therefore, in referring to that testimony in these findings of fact, this court is unable to give exact page and line citations to the testimony.

Based on the live testimony and the documentary and video record, the court finds that the following facts are supported by a preponderance of the evidence. The findings are identified by letters of the alphabet for ease of reference in future proceedings.

A.    Early on the morning of November 15, 2014, Sergeant Walker, a United States Army medic, called 911 to report that, having just returned home after working a night shift at Tripler Army Medical Center, he had discovered his wife, Catherine Walker, dead in the second-floor master bedroom. The home was located in the Aliamanu Military Reservation on Oahu.  Military Police, emergency medical personnel, Honolulu Police Department (HPD) officers, and federal firefighters responded to the call.

B.  At about 6:40 a.m., Officer Emily Partridge of the United States Army Military Police[1] arrived at Walker's house without any sirens, mistakenly believing that she was responding to a DUI call.  After ringing the doorbell multiple times and banging on the door, she heard someone running down some stairs, yelling, "I'm here, I'm here."  Walker then unlocked the front door.  About ninety seconds had passed from the time Officer Partridge had started ringing the doorbell until Walker arrived at the door.  While Officer Partridge was banging on the door, her partner, who had been patrolling the neighborhood, pulled up in the driveway but did not walk up to the front door of the house.

C.  Officer Partridge testified that Walker "was frantic, but calm at the same time" when he opened the door.  He was on his cellphone, speaking to one of the command leaders from his unit.  According to Officer Partridge, Walker told her, "She's up there.  She's up there."  Walker then led Officer Partridge up the stairs.  Officer Partridge pushed open the master bedroom door, which was already ajar.  From the doorway, with Walker standing behind her, Officer Partridge saw a woman lying on her back on the floor with one arm above her head and

_____

[1]  The court refers to military law enforcement personnel as "officer" and "agent" rather than by military rank to make their roles clear.

4

one to the side.  According to Officer Partridge, in the
daylight, she saw blood, which "appeared to look dry, but still
moist in some parts."

D.    At this point, about four or five emergency
personnel arrived and went up the stairs past Officer Partridge
and Walker to begin life-saving procedures.  Officer Partridge
asked Walker to go down the stairs and outside of the house,
where she planned to ask him for personal information.  Walker
responded that he would be more comfortable sitting on the couch
in the first-floor living room; Officer Partridge allowed him to
sit there while she spent ten to fifteen minutes obtaining
information from him.  Officer Partridge testified that Walker
rocked back and forth on the couch, repeating, "I don't know
what I want to do.  I don't know what I want to do."[2]  Although
he told Officer Partridge that he had unsuccessfully performed
CPR on his wife, Officer Partridge noticed that he was "clean"
and that there was no blood on him or his clothing.  At Officer
Partridge's request, Walker got his wife's ID from her purse to
help medical personnel identify her.  While this was happening,

---

[2]    Officer Partridge at first testified that she heard
Walker say, "I don't know what to do."  On redirect examination,
after refreshing her memory with her written report, she
clarified that Walker's exact words were "I don't know what I
want to do."

Staff Sergeant Green, Officer Partridge's patrol supervisor, arrived.

E. At about 7:00 a.m., Officer Thomas Sides, a United States Army Military Police investigator, arrived and began to "secure the scene and preserve evidence." He stationed Officer Partridge at the front door to monitor who went in and out of the house, and he had another person do the same at the back door of the house.

F. After she had gotten the information she needed from Walker, Officer Partridge again asked Walker if he would go outside so that law enforcement officers could process the crime scene. Walker went outside and waited on the front porch. Officer Partridge stood on the front porch as instructed and wrote down the time and identity of people going in and out of the house until about noon, when she was relieved of her duty. Officer Partridge says she did not order Walker to stay or remain on the porch and was not told to monitor his movements. She testified that, even after Walker had stepped onto the porch, she would later have allowed him to go back into the house to use the bathroom.

G. At around 8:00 a.m., a chaplain arrived at the house to meet with Walker. Other members of Walker's chain of command and HPD officers also arrived. According to Officer Partridge, there were about three military police officers, two

HPD officers, and a traffic investigator standing outside of the house in various areas of the street, sidewalk, front lawn, and back area of the house.  Officer Partridge was the only one standing next to Walker on the porch.  Officer Partridge overhead Walker telling HPD officers that he had had an argument over food with his wife the previous day before he left for work.  She also overheard him telling the chaplain, who was speaking one-on-one with him on the front porch, that he and his wife had been unsuccessful in trying to have children, that this had made his wife very depressed, that his wife had had thoughts of suicide, and that she had been staring out of their bedroom window when he left for work the prior evening, which had seemed "very strange" to him.

H.   A little before 9:00 a.m., Special Agents Ian Mitchell and Charles Baker of the Army's Criminal Investigations Division (CID) arrived at Walker's house in an unmarked CID Chevy Impala.  Agent Baker testified that, when he first arrived at the house, he saw Walker "being hugged by somebody in his chain of command" on the sidewalk or road.  Agent Baker noticed that Walker was "tearful" and looked "very upset."

I.   Agent Mitchell was part of the Special Victims Unit, which handles sex crimes, but had been instructed by the General Crimes Team Chief to help in the murder investigation at Walker's house.  His task was to interview Walker about his

7

discovery of his wife's body and to establish a timeline of events leading up to her death. Agent Mitchell began by going up to Walker on the front porch, shaking his hand, and introducing himself. He then told Walker that they needed to go to the CID office together to talk about what had happened. Although Agent Mitchell could not recall the exact words he used to convey this "need" to Walker, it appears he did use language conveying some necessity. He testified before the court, however, that if Walker had not wanted to leave his wife's body, that concern would have been accommodated. Agent Mitchell said he would have done his best to gather any physical evidence at the house and would have been content to schedule extensive questioning at the CID office for later. That turned out to be unnecessary. According to Agent Mitchell, Walker did not hesitate or object, replying, "Okay." Agent Mitchell described Walker as appearing "concerned" but "cooperative," not "distraught to the point where he was inconsolable."

   J.   According to Agents Baker and Mitchell, Walker was not arrested or handcuffed, and no weapons were drawn. They heard no one imply or tell Walker that he was a suspect in his wife's death. In fact, neither agent suspected at the time that Walker had killed his wife.

   K.   Agent Mitchell pointed out the unmarked CID Chevy Impala and walked with Walker to the car. The car had a police

radio in its front panel, but no cage separating the front and back seats.  Agent Mitchell sat in the back with Walker, behind Agent Baker, who was driving.  Walker opened the car door himself and got into the car on his own.  He was not patted down for weapons.

L.    The drive to the Schofield Army Barracks CID office took about thirty minutes.  During the car ride, Agent Mitchell engaged in small talk with Walker but did not discuss anything related to his wife's death.  At the CID office, the agents entered through the front doors with Walker, not through the back door that a CID agent would normally have used with a suspect.  In fact, according to Agent Baker, a suspect would typically have been transported by Military Police officers, not CID agents, and would have been handcuffed.  CID procedures required visitors to leave their cellphones in a lockbox before heading into interview rooms.  Walker left his cellphone, which was not searched until later, after he had consented to a search.

M.    According to Agent Mitchell, Walker was led to an interview room that was about six feet by ten feet and did not have any windows.  There were two chairs and a table, and an adjoining restroom.  One of the walls had what appeared to be an ordinary mirror, behind which audio-visual equipment was set up to record the interview.  According to Agent Mitchell, Special

Agent Paul McNally and Captain Mahoney from the staff judge advocate's office watched parts of the interview through the mirror, unseen by Walker. Although Walker was not expressly told that the entry door to the interview room was unlocked, he saw Agents Mitchell and Baker freely going in and out of the room without locking or unlocking the door several times that morning. Only one agent remained with Walker at a time, and there were periods in which Walker was in the room alone.

N.   Arrangements were made to get a change of clothing for Walker and to provide Walker with housing pending the investigation and processing of the crime scene.

O.   At approximately 11:00 a.m., Agent Mitchell began a videotaped interview of Walker, the transcript of which is at Government's Exhibit 6, ECF No. 157-6 (referred to hereafter as "Interview Transcript" with page references being to the typed page numbers in the upper right-hand corner).[3]  Agent Mitchell told Walker that he was being videotaped.

P.   Agent Mitchell began the interview by asking Walker if he was willing to consent to a search of his on-post residence, his person, his cars, and his cellphone.  Agent

---

[3]     The videotape begins at 10:16:55 a.m. and then jumps to about 11:03:01 a.m.  Agent Mitchell explained that he had set up a laptop with a recording device and a web camera and tested it to make sure it worked before entering the interview room to ask Walker any questions.  He said that this was why the videotape shows an earlier time stamp at the beginning and then jumps to a later time stamp.

Mitchell showed and explained a consent-to-search form to Walker, who acknowledged that he understood the form. *See* Government's Exhibit 4, ECF No. 157-4, PageID # 943.

> Q.   The consent to search form states,
>
> 3.   I have been informed by the undersigned USACIDC Special Agent that an inquiry is being conducted in connection with the following possible violation(s) of law:  Undetermined Death of Catherine Walker///
>
> 4.   I have been requested by the undersigned USACIDC Special Agent to give my consent to a search of my person, premises, or property as indicated below.  I have been advised of my right to refuse a search of my person, premises, or property.  (If you <u>do not</u> give your consent, do not sign this form.).

*Id.*  Walker consented to the search requests and signed the form.  *Id.*  Agent Mitchell then asked Walker for the passcode to his cellphone, which Walker provided.  Agent Mitchell noted the passcode on the form, *id.*, then left the interview room.

R.   Agent Baker entered the room to collect the clothing Walker was wearing to test it for any trace evidence it might have from Walker's reported performance of CPR on his wife before Officer Partridge arrived.  The agents had clearly anticipated getting Walker's consent to collect physical evidence from his person because a large brown sheet of paper was already on the floor of the interview room for Walker to place his clothes on.  In a respectful and sympathetic voice, Agent Baker directed Walker to remove every piece of clothing he

was wearing and to place each item on the brown paper.  On the video of the interview, Walker is shown completely naked for a brief time until he put on other clothes.

S.   Walker asked to use the restroom, which was connected to the interview room such that he did not need to go out the door of the interview room.  Walker asked whether he should wash his hands, and Agent Baker told him to "hold off" on doing that until he had been completely processed.  Agent Baker collected Walker's clothing, took scrapings from his hands and fingernails, and took his fingerprints.  Walker asked him, "Do we know how much longer?"  Interview Transcript at 13.  Agent Baker responded, "Well, here's the good.  There's about a million and a half people right now doing everything that they can for you."  Id.  Agent Baker then left the room, where Walker remained alone for about thirty minutes.

T.   At about 11:49 a.m., Agent Mitchell came back to take a "general statement."  According to Agent Mitchell, the purpose of interviewing Walker was to establish a timeline of events leading up to the discovery of Walker's wife, to determine the last time Walker had seen his wife alive, and to figure out the last time someone other than Walker had seen her alive before Walker came home to find her dead.

U.   In the course of being questioned, Walker mentioned that his wife had cleaned the car, which had been

broken into earlier in the week.  Walker said his wallet had been stolen then.

V.    After about thirty-five minutes of questioning, right after asking about Catherine Walker's activities, Agent Mitchell switched subjects and said, "Okay.  So, again, I've got to ask the question.  Were you having any type of relationship outside of your marriage?"  Interview Transcript at 49.  Walker responded, "Oh, I was correlating with (inaudible) people."  *Id.* Agent Mitchell said, "So -- so when you say correlating, what does that mean?"  *Id.* at 50.  Walker answered, "Talking back and forth.  I did meet a couple of people."  *Id.*  Walker further explained that he had started meeting random males and females through Craigslist beginning in June 2013.  *Id.*  He told Agent Mitchell that a couple of these people had come over to his house when his wife was out of town.  *Id.*  Agent Mitchell asked, "And these were sexual relationships?"  *Id.*  Walker said, "A couple of 'em."  *Id.*

W.    Agent Mitchell continued questioning Walker about these relationships and his relationship with his wife.  At one point during this line of questioning, Walker stopped and said, "I'm sorry, this is really hard" and "Sorry.  I'm having a hard time."  *Id.* at 52.  Agent Mitchell said, "I'm also a Christian, you know.  I judge not, lest ye be judged, you know what I'm saying?"  *Id.*  Walker repeated that he was "having a hard time."

*Id.* Agent Mitchell stated, "Yeah. I understand. Absolutely. So we -- we will -- we will get through this together." *Id.* He then told Walker, "We got to -- we got to talk about these particular details because, unfortunately, you've been put in the position now that we have to -- we have to examine all this stuff, okay? You know the deal. You've gone through those classes." *Id.* at 53. Agent Mitchell was apparently referring to criminal justice classes that Walker had taken. Agent Mitchell probed Walker about his relationships and later asked if Walker knew someone who could have killed his wife. *Id.* at 53-63. Walker responded, "No idea." *Id.* at 63.

X.   At about 12:40 p.m., Agent Mitchell proposed breaking for lunch and offered to get some fast food for Walker. Walker told him that he thought his "body's hungry" but that he did not have an appetite and had not eaten since the night before. *Id.* at 65. Agent Mitchell noted that Walker could use the restroom. Agent Mitchell left, then returned with some lunch for Walker and left him alone for about forty minutes to eat his lunch.

Y.   At about 1:54 p.m., Agent Mitchell came back to question Walker and observed that Walker had not eaten much of his lunch. Agent Mitchell again questioned Walker about the events leading up Walker's arrival at home when he found his wife dead. Several minutes later, Agent Mitchell noted, "Okay.

All right.  Now, I've -- I've talked to my -- my computer guys over here so we've got some questions that we've got to really kind of flush out here." *Id.* at 74.  He said that, based on evidence found on Walker's cellphone, he had to advise Walker of his *Miranda* rights.  Agent Mitchell said, "I'm willing to ask you questions specifically, and the Army requires me to . . . have you sign this form before we . . . ask those questions." *Id.*

Z.    Agent Mitchell then presented Walker with a Rights Warning Procedure/Waiver Certificate and advised him of his rights.  *See* Government's Exhibit 7, ECF No. 157-7, PageID # 1053.  Walker said that he understood his rights, and Agent Mitchell asked him if he wanted a lawyer.  Walker responded, "Yes."  Interview Transcript at 78.  Although this "yes" was not said loudly, it was said clearly.  There is no evidence that Agent Mitchell did not hear Walker's response, either from the videotape of the interview or from Agent Mitchell's live testimony before this court, when he could have told the court about any problem with hearing Walker's response.

AA.   Notwithstanding Walker's clear request for an attorney, Agent Mitchell did not stop questioning Walker.  The following exchange then occurred, with Walker covering his face with his hand and crying:

> Special Agent Mitchell:  Okay.  You -- you want a
> lawyer?
>
> Walker:  I'm sorry.  If this --
>
> Special Agent Mitchell:  Yeah, okay.  So here's
> the deal.  I've got to ask the question --
>
> Walker:  No.  You know (inaudible).
>
> Special Agent Mitchell:  Right.  Your -- your --
> your -- your wife was stabbed, all right, and I
> need to ask whether -- whether or not you know
> anything about it, okay?  In order for me to do
> that, I have to -- I have to advise you okay?  So
> do you want to talk now, or do you want a lawyer
> now?
>
> Walker:  I don't want to talk now.

*Id.* at 78-79.  Once again, Agent Mitchell was undeterred by
Walker's invocation of his rights.  Agent Mitchell said, "I've
got to ask the question," indicating that he needed Walker to
complete the waiver of rights form so that he could do his job.
*Id.* at 79.

BB.  Although indicated as "inaudible" in the
transcript, at one point, the videotape shows that Walker asked
Agent Mitchell, "So you think that I did this to her?"  *Id.*
Agent Mitchell responded that "it's possible but we don't know"
and explained "[t]hat's why I've got to ask the question."  *Id.*
The use of words like "I need to ask" and "I've got to ask"
echoes the references to necessity that Agent Mitchell used in
asking Walker to go to the CID station.  Questioning continued
with Agent Mitchell asking Walker again if he wanted a lawyer
and if he would be willing to make a statement without having a

lawyer present.  At this point, Walker asked, "I can stop at any time?"  *Id.* at 80.  Agent Mitchell told him, "That's correct." *Id.*  Agent Mitchell then told Walker that he needed to sign the form indicating that he wanted to talk to Agent Mitchell.

CC.  The interview continued until Walker again asked for a lawyer at about 2:39 p.m.  In the course of the forty or so minutes of questioning between when Walker first asked for a lawyer and when Agent Mitchell ended his questioning, Walker repeated his earlier statement, *see id.* at 79, that he did not want to talk with Agent Mitchell, saying, "I don't want to talk about this any more."  *Id.* at 93.  The questioning continued.

DD.  Agent Mitchell asked Walker more about his extramarital relationships.  He also asked him why his "bloody fingerprint" would be on the knife found on the floor next to his wife's body.  *Id.* at 86.  This court has before it no evidence that such a fingerprint had indeed been found.  In response to Agent Mitchell's questions, Walker suggested that his wife might have committed suicide.  *Id.* at 87.

EE.  Agent Mitchell then cautioned Walker at considerable length:

> Right.  There are certain points in our life
> that we look at and when I look back, I say,
> okay, this was a crossroads in my life; that had
> I made this decision differently, I might have
> ended up somewhere different.  Very rare -- it's
> very rare in our lifetimes to know that you're at

a certain point in your life that can go either way, okay?

I'm a firm believer in being able to admit mistakes when they happen, okay? Because what happens is if it doesn't get admitted, then what -- it just bury -- you just bury yourself in guilt, self-doubt, and reasons why you couldn't say the truth, okay?

I don't personally understand sometimes why people will simply take the easier way of not talking than when if they can get it off their chest, there's some type of relief there. I've seen it. I've talked to literally hundreds of people every -- every year that I've been doing this job, and I've been doing this job for over ten years, okay?

You're at -- you're at a point here that you need to understand that there are going to be some real hard questions asked; and if you're not truthful about them right now, then later on you're going to look back and wish you were at least able to get your story and what really happened in those scenarios out because once this train starts rolling, it's -- it's very hard to stop and try to come back around. It's kind of on a one-way street and that's what we're heading right now.

So you get -- you get very few opportunities to tell the truth right away. And I think you know what the truth is, and sometimes it's difficult to talk about the truth. But here in this room right now, I think you know more than what you're telling me, okay? I've been doing it for a long time, Mike. This is my job. This is my profession, you know?

I know that you've probably had a lot of self-doubt and issues throughout your entire life, both between -- between religion and finding yourself. A lot of guys go in the military to try to get that discipline and that way -- way ahead and to get that feeling of being

out of the area that they're in so they can find a new way, a new path.

And I think that you got into those new paths here and maybe, you know, Cathy didn't agree with the -- what you were -- what you were doing, there was some type of lifestyle issue that you were dealing with as far as a demon or something that you really wanted to live your life a certain way, and she didn't agree with that.

And I understand that (inaudible) life was rocky and that it could be difficult at times and sometimes in those moments we see only the things that are right in front of us, and the thing right in front of you causes us to be very angry; and once the anger comes out, we become a different person.

You know, we talk about different levels. There's the person that you pro -- you know, you project, right, to other people in your workplace, the person you are with family, and then there's the person deep inside that only you know about. And I think that person was trying to get out and maybe -- and maybe Cathy didn't agree with what she saw inside of you and that made you very angry because it's very rare for people to get that type of acceptance of different lifestyles just -- just on -- on face value, you know.

She came from a very strict religious background, you grew up a similar way, but your path was different. And maybe God has a different path for you. But right now, you've put -- you've put -- we've -- he's put us in this room right now to discuss really what happened to Cathy. So I need you to tell me what happened to Cathy because I know you know what happened.

*Id.* at 87-90.

FF. In response to this lengthy monologue, Walker simply responded, "I know that she's dead." *Id.* at 90. Agent

19

Mitchell picked right back up, saying, "I think you know why she's dead." *Id.* He continued, "What happened, Mike? We need to know. The answer is there. Forensics doesn't lie, and it's already there, Mike. I've been doing this for 13 years, and you know it." *Id.*

GG. At this juncture, Walker said that he had been seeing a woman named "Lisa" who had told him that she wanted him to leave his wife. *Id.* at 91-92. When Walker would not provide detailed information, Agent Mitchell again referred to bloody fingerprints and said, "I need to know the scenario." *Id.* at 93. Walker answered, "I did not kill my wife." *Id.* Agent Mitchell repeated that he "need[ed] to know the scenario where she got hurt." *Id.* It was at this point that Walker, as noted above, invoked his right to be silent for the second time, saying, "I don't want to talk about this any more." *Id.* Still persistent, Agent Mitchell stated, "That's it, you're just going to leave it hanging? This is what's going to happen. They're going to find forensics, and it's going to look bad, Mike. That's it. It's going to look bad." *Id.* Agent Mitchell pressed on. Walker told him that he was giving him all the information that he had, but Agent Mitchell repeatedly suggested that Walker was lying and hiding something and referred to evidence suggesting that Walker was not telling the truth. *Id.* at 94-97.

HH.  Agent Mitchell eventually tried to induce Walker into taking responsibility:

> How can I -- how else can I make the realization that you're trying to not take responsibility for your actions?
>
> And that's what -- that's -- everyone is putting the scenarios.  At any point in time, they could do anything.  But when they try -- when they do end up doing something and they -- and they think they're going to get in trouble for it, their first reaction is to lie about it and try to cover it up.  That's human nature.
>
> But when confronted with the facts, they -- and they continue to lie, all that says to me is, is that you've got an absolute disregard for whatever happens from now on.  You just don't care any more.  You've got no responsibility or sense of self-worth and let someone come in there and make these type of, you know, actions and not have -- hold yourself responsible for it if you've -- if you, you know -- you know, if you're responsible for it.

*Id.* at 95-96.  To these statements, Walker repeated, "I didn't want my wife dead."  *Id.* at 96.  Agent Mitchell responded by again accusing Walker of lying and suggesting that he was involved in his wife's murder.  Agent Mitchell said, "You telling me, you know, you just showed up and you don't know what happened is pretty unbelievable, okay?"  *Id.*

II.  Agent Mitchell then launched into another monologue, this one containing the first of three references to Walker's commander:

> Everything you're telling me right now I -- going to work, who you saw, who you were with, you were definitely, definitely doing that.  I

believe you came home. I believe you performed
CPR on your wife, but I think she was hurt before
you left work, and I think you know who did it.

And if it doesn't come out now, it will come
out later. And when it does and you were given
the opportunity to give your side of the story
and you didn't, it's going to look bad because we
don't decide what happens to you, you know. Ian
Mitchell is not going to decide whether or not
you're going to get any type of, you know,
punishment for this. Ian Mitchell, all he does
is he goes and he -- he reports the facts. The
people that decide what happens is your
commander, okay? That's how UCMJ works.

Now, if I go to my command -- if -- if I go
to your commander and say, look, we have all of
this evidence saying that Mike said no, but he
didn't want to give me a scenario where it -- it
explained all this information, then what's it
going to look like to a commander? What's it --
or an un -- disinterested third party?

Who -- who's going to say, well, look, Mike
took responsibility for the actions, it happened
in the heat of the moment, and that was it.
That's what happened. People get out of control.
And it's not who they are, it's simply an action
that they took, and that was it. Mistakes are
made.

*Id.* at 97-98.

JJ. After this monologue, Walker said, "You're
telling -- you're telling me that I got out of control and hurt
my wife." *Id.* at 98. Agent Mitchell asked, "Did you?" *Id.*
Walked answered, "No." *Id.* Walker explained that he did not
know what had happened, but Agent Mitchell was unflagging. He
said:

I don't know is insufficient. Your wife is
gone. People are asking questions, and the

22

questions are what did Mike do?  Because that's
all I've got right now.  I've got a bloody knife
and your wife attacked in the bedroom.  No -- no
signs of forced entry.

Did an (inaudible) come in there and do it?
I mean, I'm not trying to be, you know, glib
about it, but what -- what other scenario do you
see?  Someone had to have access to the house,
and someone had to have access to your wife.  Who
is that?

You have -- you haven't given me any
explanation other than you just showed up and it
happened, but that's not -- that's not what the
facts are showing.  So I've got to assume that
you're not telling me the truth about something.
What is it, Mike?  I need to know.

*Id*. at 98-99.

KK.  Walker again referred to "this Lisa girl" and
said, "The only thing I can think of is that she did it."  *Id.*
at 99.  Agent Mitchell asked more questions about Lisa and about
Walker's relationship with her.  *Id*. at 99-100.  When Walker
said he was unable to provide Lisa's last name, Agent Mitchell
plunged into another drawn-out monologue, again referring to
Walker's commander and invoking religious themes (Walker is
Mormon):

And the people that get hurt are often hurt
by the people that are in their immediate family
and that's the people that we look at because 99
percent of the time it's someone that they know.

To have someone snap to the point where they
break into a house without their -- your wife
hearing about it, going into the room, and then
attacking her is very unlikely.  I -- you would -

- you would literally be hit by lightening [sic] before that would happen.

It -- Mike, you -- you know what happened. I -- I -- I want to hear it from you. You tell me. You get that off of your chest and that weight is immediately lifted. I know because I've been in this scenario before. The people that tell me these things are immediately relieved that that happened. Immediately. And then we can get them the help they need.

Denial is going to just make it harder later on, and -- and I don't want that for you. You've already had a very difficult life, and I know it. I know it just by the conversations that we've had. You are -- you have inner turmoil that I -- I very rarely see that ends well for anybody. And by just adding that rock to your backpack and not telling anybody about it is just going to make it harder later on, okay?

We have literally dozens of people right now going through your room getting that forensic evidence, and it's going to tell us a story, but I need you to help me tell your side of the story in order for us to get to the right conclusion on this, okay, to find the truth, and that involves you. And just an outright denial for that doesn't let us get to that opportunity to let people know what really happened.

Cathy deserves to have that story told, okay? You deserve to get that off of your chest, and you -- when you don't, all that happens is that it just gets worse and worse. It's a spiral. I've seen it. I don't want that to happen here because you have the opportunity, and you didn't give the opportunity, and you just gave it away. You let someone just keep -- keep assuming the worst about what Mike's life is like, and you're not explaining it.

I can't live in your shoes every day. I've got an idea of what happened, but the only way you can tell me -- the only way I can fully understand is when you tell me exactly in your

own words what happened to Cathy, and you know. You know what happened, and we have to get that story out because the alternative is very bad, Mike, very bad, and I need some type of evidence that I can bring to your commander and to let them know that you're human, you made a mistake, you're taking responsibility for your actions, and you can get on with your life because that's what we're talking about right now.

We're talking about a crossroads, and you want to take the path of the righteous. I know you do. I know that there are opportunities that we can give you a hand to take you into the right position where you need to be, and that is telling the truth about what happened. It's a mistake. It happened. You are not a bad person because of it.

I've talked to Clerige already. That's part of the conversation I've had with him. He knows that you're a good man, but good men make mistakes every single day, and they have an opportunity, once it's presented, once you're given a hand up, are you going to take that hand and go to the path of the righteous?

I hope you do because I'm here. I'm standing in front of you saying, Mike, what happened? And you telling me no or I don't know is the coward's way out; is the way that you need to do to somehow feel better about what happened, but the reality is the truth is what sets you free.

Am I right? The truth in this scenario is that you know what happened to Cathy, and I need you to tell me that because I've got dozens of men right now working on that scene, and they are going to tell their own story. And when there's an absence of information, we will fill it in on our own and, in reality, a lot of times that's the worst possible information we can think of.

We need to get the truth out here, and you need to help me tell that to your commander so when he talks to him -- when I talk to him, I can

say Mike made a mistake, it was the heat of the moment, he snapped, that was it. He's not a bad person. He's a good soul that needs saving. And I'm sure Cathy wants that for you to make sure that you're saved later on. And the first thing you have to do is admit those problems that you have.

You may have been going down the wrong path, Mike, but the reality is, is you have an opportunity right now to tell me what really happened. And when you tell me that, then we can start the process of healing and getting the help that you need; but until you say that, I can't help you. I can only assume the worst and what these -- the forensic experts tell me.

We've got guys down there with masters degrees. I'm talking to other doctors, and they're all going to tell me one story, but the one thing I don't have is Mike's story. What happened to -- to -- that caused Mike to -- to hurt Cathy, okay?

I need that story so I can tell that to the commander so we can give that opportunity for you to get your side heard and right now, today, is the time for -- to do that. You are at a crossroads, Mike. You are at a crossroads.

Trying to tell me that some third party snuck into the house and happen -- and did this is not the answer. You know it's not the answer because it's not the truth. The truth is already there in the forensics, and I hope -- I hope that you give the opportunity to -- to tell your story, and I want it right now. I need it right now because that's the way we talk to the commander about it.

I know that nothing happens in a bubble. You have an opportunity to tell me, and I need that right now.

*Id.* at 101-05.

LL.  Walker then interrupted Agent Mitchell.  Raising his voice and pounding his fist on the table, Walker blurted out, "I have a problem . . . .  I'm a sex addict."  *Id.* at 105.  In an agitated tone, Walker told Agent Mitchell that he was "staying with a frickin' psycho bitch" who "[t]hreatened [his] wife's life because she wanted to be with me and me only."  *Id.*  Speaking erratically, Walker explained that he had not thought "Lisa" would actually kill his wife.  *Id.*  Asked why he had not told Agent Mitchell this earlier, Walker said that he had not thought "Lisa" was "crazy enough to do anything like this" and that he did not know what to think.  *Id.* at 106.  Walker explained, "My mind's been (inaudible) trying to come up with all the information that you want."  *Id.*  Walker then put his face in his hands and started crying.

MM.  Agent Mitchell continued questioning Walker and then said, "[I]f it's a story, we're going to find out about it.  I'm not going to just simply let it pass, okay?  I need you to look me in the eye and tell me that this is the only way that could have happened."  *Id.* at 107.  Without any hesitation, Walker looked at Agent Mitchell and responded, "This is the only way that it could have happened."  *Id.*  Walker again insisted, "I did not kill my wife."  *Id.*

NN.  A few seconds later, Walker asked again for a lawyer.  Agent Mitchell agreed to get him a lawyer and stopped

the interview at around 2:39 p.m.  Walker was left alone in the interview room for another ninety or so minutes, during part of which he covered his face with his hand and cried.  The videotape ends at around 4:07 p.m.

OO.  After 4:07 p.m. (so not shown on the videotape), CID Agent Mark Pezel entered the interview room to speak with Walker about the break-in of his car and the theft of his wallet.  According to Agent Pezel, he had been told by military attorneys that he could question Walker if he restricted questions to the car break-in and the theft of his wallet.  Walker told Agent Pezel that he had reported the incident to HPD.  According to Agent Pezel, Walker remembered the exact nine- or twelve-digit case number for the police report.

PP.  During this exchange, Walker reportedly asked Agent Pezel for a pen and paper.  Agent Pezel provided Walker with a pen and paper, then left the room.  For reasons not stated in the record, Agent Pezel then came back.  He says that Walker then showed him a one-page handwritten note relating to accusations about his involvement in his wife's death.  Walker's note included questions addressed to himself, such as, "If I killed my wife before I went to work, then how did Cathy send me a text while I was at work?"  Government's Exhibit 8, ECF No. 157-8, PageID # 1054.  The note also asked, "Why does Agent Mitchell claim that the bloody fingerprint on the knife are mine

if I was not fingerprinted prior to questioning so that investigators could determine my prints at the scene?  My prints were not in CODIS."  *Id.*  Walker also wrote, "If Lisa is the culprit, did she manage to make a copy of my house key while we were seeing each other regularly?"  *Id.*

QQ.  After reading the note, Agent Pezel asked Walker if he could make a copy of it.  According to Agent Pezel, Walker agreed.  After making a copy and giving the note back to Walker, Agent Pezel asked Walker more questions.  Again, this portion of the questioning was not videotaped.

RR.  Arrangements were made to release Walker to his unit while Walker's house was being processed.  Walker finally left the CID office at about 10:00 p.m., more than fifteen hours after Officer Partridge had arrived at Walker's house, about eleven hours after Agent Mitchell had started running the videotape, and about seven hours after Agent Mitchell's videotaped questioning had ended.  Walker was not arrested that day.

III.     **CONCLUSIONS OF LAW.**

A.     **Overview of Legal Issues.**

Before addressing the law applicable to the facts summarized in this order, this court identifies what is in issue.  The issues are tied to different periods in law enforcement's interactions with Walker on November 15, 2014.

The parties in their briefs refer to "pre-lunch" and "post-lunch" discussions, but this court finds it helpful to use labels that more directly identify issues.

First, there is no dispute that statements made by Walker before he was questioned about extramarital affairs on page 49 of the Interview Transcript should not be suppressed on Fifth Amendment grounds. At the hearing before this court on July 31, 2017, Walker's counsel stated unequivocally that he was not claiming that statements before that point were made in violation of *Miranda.* That is, before that point, Walker was not both in custody and subject to interrogation such that *Miranda* warnings should have been given.

This court does not here suppress any statement by Walker at his house or at the station before he was questioned about extramarital affairs on page 49 of the Interview Transcript. The court will refer to such statements as "Statements Preceding Extramarital Questioning." Because of the agreement by the parties that Statements Preceding Extramarital Questioning were not made in violation of *Miranda*, the court does not focus its legal analysis on the content of those statements, although the circumstances surrounding those statements are set forth in some detail in the findings of fact because they provide context for the court's legal conclusions concerning later statements.

Second, the Government has conceded that, in light of Walker's invocation of his right to counsel, it will not use in its case in chief any oral statement from the point of that invocation until the recorded interview ended. The discussion of the *Miranda* rights waiver form occurs from page 74 to page 80 of the Interview Transcript. On page 78 of the Interview Transcript, Walker clearly invokes his right to counsel. It is the court's understanding that the Government's agreement with respect to its case in chief covers statements from page 78 through page 107 of the transcript. The court will refer to such statements as "Post-*Miranda* Recorded Statements."

The above two positions leave three matters in issue: (a) the status of statements appearing from page 50 to page 78 of the Interview Transcript (i.e., between the start of extramarital questioning and the invocation of the right to counsel), which the court will refer to as "Extramarital Statements"; (b) whether Walker's Post-*Miranda* Recorded Statements (pages 78 through 107 of the Interview Transcript) may be used for impeachment purposes; and (c) Walker's handwritten note and any statements referring to that note, which the court will refer to as "Handwritten Note Evidence." Placed in chronological order, the evidence consists of Statements Preceding Extramarital Questioning, Extramarital

Statements, Post-*Miranda* Recorded Statements, and Handwritten
Note Evidence.

As detailed in the pages that follow, this court
suppresses the Extramarital Statements for all purposes;
precludes any use of the Post-*Miranda* Recorded Statements,
including for impeachment purposes; and suppresses the
Handwritten Note Evidence for all purposes.

> **B.    There Is No Fourth Amendment Violation Relating
> to the Statements Preceding Extramarital
> Questioning.**

1.    Before turning to the Fifth Amendment issues
that are at the heart of this motion, this court addresses
Walker's claim that he was seized in violation of the Fourth
Amendment.  Given the court's suppression on Fifth Amendment
grounds of the Extramarital Statements, the Post-*Miranda*
Recorded Statements, and the Handwritten Note Evidence, the
court concludes that the Fourth Amendment argument is in issue
only for purposes of the Statements Preceding Extramarital
Questioning, which Walker agrees should not be suppressed on
Fifth Amendment grounds.  This court denies the motion to
suppress the Statements Preceding Extramarital Questioning on
Fourth Amendment grounds.

2.    Walker asserts that he was arrested without
probable cause because he was "merely present at the scene of a
crime."  ECF No. 147-1, PageID # 813.  He says that any

statements made during this allegedly illegal detention must be suppressed as violative of the Fourth Amendment.  *Id.*, PageID # 812.

3.    The Government contends that Walker "voluntarily accompanied the agents to the CID office so that they could try to learn what had transpired."  ECF No. 157, PageID # 908.  While acknowledging that "there may be an issue as to when WALKER was in custody such that his *Miranda* warnings needed to be given to him," the Government says that Walker was never detained for Fourth Amendment purposes.  *Id.*

4.    The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.; *see United States v. Place*, 462 U.S. 696, 700 (1983).

5.    "It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was purged of the primary taint."  *United States v. Redlightning*, 624 F.3d 1090, 1102 (9th Cir. 2010) (quoting *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007)).

6.  "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Circumstances indicating a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

7.  In this case, no seizure occurred at Walker's house or at the CID office before Walker made the Extramarital Statements. The events at Walker's house took place in public and in response to Walker's own 911 call. With that call, he invited law enforcement to come to his house to address his wife's death. Walker was not handcuffed, arrested, or patted down at his house (or indeed at any time on November 15, 2014). At his house, he was free to speak to a chaplain, to hug an officer in his unit (possibly while on the sidewalk or street, according to Agent Baker), and to use his cellphone. The only reason he was asked to remain outside of the house was to permit the crime scene to be processed. When Officer Partridge initially asked Walker to step out of the house and Walker said he would be more comfortable sitting on the couch,

Officer Partridge had no problem allowing him to do that.  She also testified that, even after Walker had stepped onto the porch, she would later have allowed him to go back into the house to use the bathroom.  There was, in short, no seizure at the house.

8.   Notwithstanding Agent Mitchell's references to needing to have Walker go to the CID office, Agent Mitchell did not need that to happen right at that moment.  He testified before this court that he would have accommodated any request by Walker that he be allowed to stay at home that day to be with his wife's body.  Agent Mitchell said in that event he would have done whatever he could have done at the house, then scheduled an office interview for a later time.  The evidence in the record indicates that Walker's agreement to go to the CID office on November 15, 2014, was voluntary.  By action and words, Walker showed that he was entirely willing to go to the office.  He agreed to go without questioning the need to do so or objecting to the timing, opened the car door himself, and climbed on his own into the back seat.  He took his cellphone with him, so could have called anyone he wanted during the car ride.  He was not seized during that car ride.

9.   Once at the station, he turned over his cellphone, which was routine for visitors.  In the interview room, he consented to searches, and nothing in the record

suggests that the consent was coerced. Until he was asked about having any extramarital affair, which is a criminal offense under the Uniform Code of Military Justice, he was not asked about having done anything illegal. Indeed, at the hearing on this motion, Walker's attorney conceded that the questioning was nonobjectionable up to that point.

10. The agents Walker spoke to at the CID office were not in law enforcement uniforms or tactical gear and had no weapons visible or drawn. No one physically restrained Walker, and, until the extramarital issue was broached, no language was used indicating that Walker might be asked to incriminate himself.

11. In light of these circumstances, a reasonable person would have believed that he or she was free to leave up to the time the extramarital issue was raised. Statements made up until that time are not suppressed based on any alleged Fourth Amendment violation.

>     **C. The Extramarital Statements May Not Be Used in Any Way Given the Failure to Give *Miranda* Warnings Before Asking Questions About Any Extramarital Affair and the Involuntariness of the Extramarital Statements.**

1. At the hearing, defense counsel clarified that Walker's position was that he should have been given *Miranda* warnings before Agent Mitchell asked him if he was having any extramarital relationship. Defense counsel explained

that such a question was likely to elicit an incriminating response because adultery is listed as a criminal offense under the Uniform Military Code of Justice. Thus, defense counsel said, this court should suppress statements made after this question was asked at the bottom of page 49 of the Interview Transcript. This court agrees.

2. The Government's position is that *Miranda* does not apply to the questioning before *Miranda* rights were reviewed because Walker was not in custody. He had voluntarily agreed to go with the agents to the CID office, was allegedly not confronted with evidence of guilt until after the lunch break and after being read his *Miranda* rights, and was allegedly not questioned for an unduly long period or with any pressure before *Miranda* rights were reviewed with him. ECF No. 157, PageID #s 909-15. The Government readily acknowledges that the physical surroundings of the interview weigh in favor of finding custody, but notes that the door to the interview room was unlocked, that Walker had easy access to a restroom, and that only one agent interviewed him at a time. *Id.*, PageID # 914. At the hearing, the Government contended that, even if Walker's statements made after the extramarital question should be suppressed, the Government should be allowed to use his statements for impeachment because they were voluntarily given to law enforcement.

3.    In *Miranda*, the Supreme Court held that a person in custody is entitled to procedural safeguards before being interrogated.  384 U.S. at 443.  In the absence of such safeguards, the prosecution may not use what it learns through its interrogation.  *Id*.  This holding was premised on the Fifth Amendment's privilege against self-incrimination, which the Supreme Court reasoned is protected when a person is adequately and effectively advised of his or her rights.  *Id.* at 467.

4.    *Miranda* warnings specifically advise a person in custody that he has a right to remain silent, that anything he says may be used against him in court, that he has the right to an attorney before and during questioning, and that an attorney will be appointed if he cannot afford one.  *See id*. at 479.

5.    "An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is 'in custody.'"  *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (citation omitted).  Given the legal jeopardy that Walker faced in making the Extramarital Statements, it cannot be disputed that they were made in the course of an interrogation.  The issue, therefore, is whether Walker made the Extramarital Statements while in custody.  In determining whether an individual is in custody, a court must examine the objective circumstances surrounding the

interrogation and decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

6.    The inquiry into whether an individual is in custody does not focus on the subjective views of the agents or of the individual being questioned, but rather on whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *Id.* at 973-74 (quoting *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127 (9th Cir. 1987)).

7.    The Ninth Circuit has identified the following factors as relevant to whether an individual is in custody for Fifth Amendment purposes:

> (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.

*Id.* at 974 (quoting *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)).  These factors are not dispositive of the ultimate determination of whether an individual is in custody, but they address circumstances that frequently arise.  *Id.*

8.    This court turns to the first factor (the language used to summon Walker).  The investigation that led

agents to question Walker was initiated by Walker's 911 call.
Agent Mitchell responded to the 911 call and first met Walker on
the front porch of his house. Although Agent Mitchell could not
recall the exact words he used to tell Walker that he needed to
come with him to the CID office, Walker did not hesitate or
object when he agreed to go with him. *See United States v.
Orman*, 486 F.3d 1170, 1176 (9th Cir. 2007) (observing that the
failure to explicitly inform a person that he or she is free to
leave is not dispositive). This court has already commented on
Agent Mitchell's language. Having listened to Agent Mitchell
testify, this court notes that Agent Mitchell tends to speak in
imperatives ("You need to," "I've got to"). Nevertheless,
Walker appears to have had no problem going with the agents to
the CID office "*understanding that questioning would ensue*."
*Kim*, 292 F.3d at 974 (emphasis in original); *see id.* at 974-75
("If the police ask--not order--someone to speak to them and
that person comes to the police station, voluntarily, precisely
to do so, the individual is likely to expect that he can end the
encounter."). This factor weighs against finding Walker to have
been in custody when he made the Extramarital Statements.

9. The second factor going to whether a person is in
custody concerns the extent to which a defendant is confronted
with evidence of guilt. While Agent Baker collected Walker's
clothing and DNA samples and fingerprints as physical evidence,

no one indicated that was occurring because Walker was a suspect. Rather, Walker was told that, while he was performing CPR, trace evidence might have been transferred to his clothing and person. Agent Mitchell's initial questions sought only basic facts going to when Walker had last seen his wife alone and what Walker had done. These circumstances suggest that Walker was not initially in custody at the CID office. However, the questioning shifted from trying to get a timeline of events to a more accusatory nature when Agent Mitchell asked Walker about extramarital relationships. Even though this shift was not a direct confrontation with evidence of guilt, it was a clear attempt to elicit evidence that could be incriminating and with which Walker could then be confronted. This shift in questioning thus was a step toward such confrontation. This factor cuts in at least some respect in favor of finding Walker to have been in custody when he made the Extramarital Statements.

10. The third factor examines the physical surroundings of the interrogation, which the Government concedes suggest custody. The CID interview room was a small windowless room with a mirror behind which audio-visual equipment was set up to record the interview and military personnel could observe the interview. That observers were behind the mirror may well have been assumed by Walker, who had had some education in

criminal justice.  Even without such education, one might

suspect that a mirror in an otherwise Spartan law enforcement

room allowed behind-the-mirror observation, as commonly depicted

in television crime shows.  There were two chairs and a table in

the room, which had an adjoining restroom.  The door to the room

was unlocked at all times while Walker was in it.  Walker was

sometimes left alone in the room.  *See Miranda*, 384 U.S. at 449-

50 (noting that isolating a suspect from others may be a

technique of psychological coercion).  Although the agents said

that Walker could use the restroom, they did not allow him to do

so until after they had collected his clothing as physical

evidence.  Except for once going to the restroom, the videotape

does not show Walker leaving the interview room before making

the Extramarital Statements.  This factor weighs in favor of

finding Walker to have been in custody.

        11.  The fourth factor concerns the duration of any

"detention."  It was about 12:26 p.m. when Agent Mitchell asked

about extramarital affairs.  The interview continued until 2:39

p.m., with a lunch break of about seventy-five minutes

(including forty minutes when Walker had food to eat).  This was

clearly long enough to place the Extramarital Statements within

a period of detention.  *See United States v. IMM*, 747 F.3d 754,

768 (9th Cir. 2014) (stating that a defendant was in custody

when he spent 30 to 40 minutes during a ride in an unmarked

police car and about an hour being questioned); *United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009) (agreeing that a two-and-a-half hour interrogation weighed in favor of finding that the defendant was in custody); *Kim*, 292 F.3d at 972 (stating that a defendant was in custody during an interrogation lasting about an hour). *Cf. Hayden*, 260 F.3d at 1063, 1066-67 (concluding that a defendant was not in custody during a 20-minute interview); *United States v. Hudgens*, 798 F.2d 1234, 1237 (9th Cir. 1986) (noting that an interrogation lasting only 45 minutes supported a determination that the defendant was not in custody); *California v. Beheler*, 463 U.S. 1121, 1122, 1125 (1983) (per curiam) (finding no custody with an interview lasting less than 30 minutes).

12. The time period covered by the Extramarital Statements went from 12:26 p.m. to 2:07 p.m., which included a lunch break. That there was a lunch break might seem to cut against a custody finding, but in fact it signaled that the questions were not ending soon. A mealtime would have been a natural time to end. When the interview was clearly going to last past lunch, and in fact did pick up after lunch, that circumstance tends to make the duration indicate custody. The Extramarital Statements had been preceded by noncustodial events running from about 6:40 a.m. to 12:26 p.m. Given the shifting circumstances, the duration factor involves a complicated

43

determination in this case, but, looking at all the circumstances, this court concludes that the duration factor weighs in favor of a custody finding.

13. The fifth factor goes to the degree of pressure applied to detain Walker. Agents Mitchell and Baker did not initially force Walker to speak with them. Nothing beyond what has already been discussed with respect to the preceding factors suggests any pressure was applied by law enforcement with respect to the Extramarital Statements. *See, e.g.*, *United States v. Gregory*, 891 F.2d 732, 735 (9th Cir. 1989) (affirming the denial of a motion to suppress when the defendant had "consented to be interviewed in his house, he was interviewed in the presence of his wife, the interview lasted only a brief time, and no coercion or force was used"); *Hudgens*, 798 F.2d at 1236-37 (affirming the denial of a motion to suppress when the defendant had voluntarily entered a police car to talk to police, agents had not used intimidating language during the encounter, and the defendant testified that he had not felt coerced by the agents).

14. While the encounter at Walker's house and his agreement to leave with the agents to answer questions was consensual, the court must also "consider whether these circumstances gradually escalated into a setting where a reasonable person standing in [Walker's] shoes would not have

felt free to leave, yet before agents gained probable cause to arrest." *Redlightning*, 624 F.3d at 1103. That is, the court must consider whether the Extramarital Statements were made under circumstances that had "escalated" to the point that Walker was effectively in custody. *See id.; cf. Florida v. Royer*, 460 U.S. 491, 503 (1983) (concluding that an arrest had occurred for Fourth Amendment purposes after a situation became an investigatory procedure when, in a police interrogation room, police sought to confirm their suspicions that a crime had been committed); *United States v. Moreno*, 742 F.2d 532, 535 (9th Cir. 1984) (concluding in the Fourth Amendment context that a consensual public encounter escalated into "a highly detentive environment--in a small room that had been specifically designated for police business, alone with several officers who relayed . . . that they were suspected of carrying narcotics").

15. Three of the factors analyzed above weigh in favor of a determination that Walker was in custody once the questioning about extramarital affairs began. Walker's physical surroundings and the questioning about activities that violated the Uniform Code of Military Justice weigh in favor of a determination that he was in custody. The duration factor also weighs in favor of detention.

16. This court understands that the custody determination does not require giving equal weight to every

factor, and that a person may be in custody even if more factors suggest a lack of custody. The court places particular weight on Agent Mitchell's questions about extramarital relationships, which were likely to elicit a confession or an incriminating response. Agent Mitchell or one of the other agents observing should have stopped the interview to read Walker his *Miranda* rights before proceeding further.

17. This court recognizes that Agent Mitchell has pointed to information obtained from a review of Walker's cellphone over the lunch break as causing him to suspect Walker was involved with his wife's death. However, that cellphone information consists of text messages covering the same extramarital contacts described in the Extramarital Statements. Thus, even before Agent Mitchell knew what was on Walker's cellphone, Agent Mitchell had, in the form of the Extramarital Statements, the very information that made him suspicious. Even if Agent Mitchell did not begin asking about extramarital affairs knowing what his questions would elicit, a law enforcement officer's "unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984). The relevant inquiry is what a reasonable person in Walker's position would have thought. *Id.* at 422. Up until Agent Mitchell's question about extramarital relationships, a

reasonable person would not have thought he was being detained. However, regardless of what Agent Mitchell intended, once asked about whether he had committed adultery, a reasonable person would have thought he had become a suspect who was no longer free to leave.

18.  Because Walker did not receive his *Miranda* rights until after he made the Extramarital Statements during a custodial interrogation, all statements from the bottom of page 49 of the Interview Transcript until he received *Miranda* warnings are suppressed and may not be used in the Government's case in chief.

19.  Perhaps because it has other evidence establishing what is in the Extramarital Statements and because the Extramarital Statements do not include as much substantive information, the Government has not argued as strenuously for use of the Extramarital Statements for impeachment purposes as it has for use of the Post-*Miranda* Recorded Statements for impeachment purposes.  But the court understands the Government to be indeed seeking to use the Extramarital Statements for impeachment purposes; this court declines to allow such use.

20.  Although a statement taken in violation of *Miranda* may not be used substantively in the prosecution's case in chief, the statement, if it was voluntary, may be used for impeachment if the defendant takes the stand and testifies

inconsistently. *See Harris v. New York*, 401 U.S. 222, 224-26 (1971) (noting that statements may be admissible for impeachment if their "trustworthiness . . . satisfies legal standards"). "If a defendant exercises his right to testify on his own behalf, he assumes a reciprocal 'obligation to speak truthfully and accurately.'" *Michigan v. Harvey*, 494 U.S. 344, 351 (1990) (quoting *Harris*, 401 U.S. at 225). The Supreme Court has consistently observed that suppressing a defendant's voluntary statement "would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth." *Oregon v. Hass*, 420 U.S. 714, 723 (1975). *See also Harris*, 401 U.S. at 224 (rejecting arguments that would allow a defendant to "turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths" (citation omitted)).

21. However, if a statement was taken involuntarily from a defendant, then that statement is excluded for all purposes. *Michigan*, 494 U.S. at 351; *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) ("But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law, 'even though there is ample evidence aside from the confession to support the conviction.'" (quoting *Jackson v. Denno*, 378 U.S. 368 (1964))); *Henry v. Kernan*, 197 F.3d 1021,

1028 (9th Cir. 1999) (concluding that a defendant's confession was inadmissible for any purpose because the "police tactics and trickery produced a confession which was neither rational nor the product of an essentially free and unconstrained choice").

22.  "The Constitution demands that confessions be made voluntarily." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).  A confession is involuntary *per se* if it is accompanied by physical violence. *Id.*  On the other hand, a confession accompanied by psychological coercion is not *per se* involuntary.  *Id.*  Instead, with psychological coercion, as in this case, a court must look to the totality of the circumstances surrounding the statement.  *See id.*

23.  To determine whether a statement is voluntary or involuntary "requires more than a mere color-matching of cases." *Mincey*, 437 U.S. at 401 (citation omitted).  "It requires careful evaluation of all the circumstances of the interrogation."  *Id.*

24.  There is no "talismanic definition" of voluntariness.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973).  Courts have considered the following factors in evaluating the voluntariness of a statement:  (1) the characteristics of the defendant, including his age, education level, intelligence level, state of mind, familiarity with the criminal justice system, and whether the defendant was advised

of his constitutional rights; and (2) the details of the
interrogation, including the length of the detention, the
physical environment, the use of physical punishment, such as
deprivation of food and sleep, the repeated and prolonged nature
of the questioning, the manner in which the defendant was
questioned, and the defendant's physical condition. *See id.* at
226; *see also Haswood*, 350 F.3d at 1027; *Pollard v. Galaza*, 290
F.3d 1030, 1033-34 (9th Cir. 2002). Thus, courts look to both
the "surrounding circumstances and the combined effect of the
entire course of the officer's conduct upon the defendant."
*Pollard*, 290 F.3d at 1033. "The tone of voice used and the
promises or representations made by the questioner have also
been factors used to decide whether a statement was voluntary."
*Id.* at 1034. No single factor is controlling.

25. "Each of these factors, in company with all of
the surrounding circumstances--the duration and conditions of
detention (if the confessor has been detained), the manifest
attitude of the police toward him, his physical and mental
state, the diverse pressures which sap or sustain his powers of
resistance and self-control--is relevant." *United States v.
Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014). Overall, a
court's determination as to the voluntariness of a statement
"depend[s] upon a weighing of the circumstances of pressure
against the power of resistance of the person confessing." *Id.*

(quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)).

A court must be careful not to "tick[] off the list of

circumstances rather than actually considering them in their

totality." *Id.* at 1017 (citation omitted). The Government has

the burden of proving by a preponderance of the evidence that

Walker's statements were voluntary. *See Lego v. Twomey*, 404

U.S. 477, 489 (1972).

26. At one extreme, the Supreme Court has found that

a statement was involuntary when it was taken from a defendant

who was in great pain at a hospital, while he was in and out of

consciousness and fastened to tubes, needles, and a breathing

apparatus. *See Mincey*, 437 U.S. at 398-99. With respect to

psychological coercion, the Ninth Circuit has found involuntary

a defendant's statement made after a detective told him that his

statement could not be used against him. *See Henry*, 197 F.3d at

1027. In that case, the Ninth Circuit found it significant that

the defendant's statement was incoherent, confused,

unresponsive, and disjointed and that the defendant was upset,

scared, and crying. *Id.*

27. On the other hand, the Supreme Court has found

that a defendant's statement was voluntary when "the pressure on

him was no greater than that on any person in like custody or

under inquiry by any investigating officer." *Hass*, 420 U.S. at

722-23. Not all law enforcement misrepresentations made to

obtain statements are necessarily coercive.  *See Pollard*, 290

F.3d at 1034.  In *Pollard*, the Ninth Circuit found it

significant that the defendant had reinitiated further

conversation with law enforcement, and that the officer made

neither promises nor threats, and did not confront the defendant

with evidence linking the defendant to the crime.  *Id.* at 1036.

The court observed that the defendant did not show signs of

discomfort, and the physical environment of the interrogation

"did not appear to be excessively uncomfortable."  *Id.* at 1035.

28.  The Extramarital Statements do not present a

situation at the extreme.  There was no physical coercion and no

lying about the legal effect of the Extramarital Statements.

But this court finds that the circumstances of the Extramarital

Statements indicate involuntariness.  The Extramarital

Statements admittedly involve a close call.  In examining the

circumstances the court focuses on the law's placement of the

burden of establishing voluntariness on the Government,

cognizant that any tie goes to a defendant because it indicates

a failure by the Government to show voluntariness by a

preponderance of the evidence.

29.  By the time he made the Extramarital Statements,

Walker had been up for a very long time.  He had worked a night

shift, come home to his wife's body, called 911, talked to law

enforcement at his house, gone to the CID office, and endured

questioning in a barren interview room with a mirror behind which there were likely observers.  He had gone through the indignity of stripping naked in that mirrored room.  Besides lacking sleep, he lacked food, having not eaten anything since the night before.  In fact, the Extramarital Statements began around lunchtime.  He was isolated for periods of time in the interview room and was without any means of contacting anyone, having given up his cellphone when he arrived at the office.  His questioner was sitting close to him and questioning him in a fairly forceful tone.  Although his questioner was not accompanied by other agents at the time, Walker knew that his questioner could easily summon others, as another agent had already been in the interview room to collect physical evidence.  Most importantly, the nature of Walker's responses to questions about extramarital affairs makes it clear that he was not responding voluntarily.

     30.  Walker's answer to the first question about extramarital affairs is telling.  He said that he was "correlating" with people.  This response is indecipherable and appears to be an attempt to answer without providing any real information.  He then refers to "talking back and forth" and "meeting" people.  It is not until he is directly asked whether "these were sexual relationships" that he concedes that they were, and even then he tries to minimize them by saying that

only "a couple" of them were. *See* Interview Transcript at 49-50. Much of what he says is inaudible. He is so upset by having to talk about the intimate details of his life that his questioner feels the need to reassure him by saying, "I'm also a Christian, you know. I judge not, lest ye be judged, you know what I'm saying?" *Id.* at 52. When Walker says, "Sorry. I'm having a hard time," his interrogator assures him, "Yeah, I understand. Absolutely. So we--we will--we will get through this together." *Id.* The Government simply fails to show that Walker is voluntarily responding, and his Extramarital Statements may not be used for impeachment purposes.

> **D.    The Post-*Miranda* Recorded Statements May Not Be Used Even for Impeachment Purposes.**

1.    The Government concedes that the clear violation of *Miranda* that occurred when Agent Mitchell continued to question Walker in the face of his request for counsel and his invocation of his right to remain silent means that the Government may not use the Post-*Miranda* Recorded Statements in the Government's case in chief. The Government urges this court to allow use of those statements for impeachment if Walker testifies at trial. This court turns once again to reviewing Walker's statements for voluntariness. With respect to the Post-*Miranda* Recorded Statements, this is not a close call. Those statements were clearly involuntary.

2.    Walker says that his free will was overborne by coercive police tactics, making the Post-*Miranda* Recorded Statements involuntary.  ECF No. 147-1, PageID # 821.  He highlights the following:  (1) Agent Mitchell ignored his repeated unequivocal invocations of his right to counsel and right to remain silent; (2) Agent Mitchell's questioning was accusatory and aggressive, referring to evidence linking Walker to his wife's death and suggesting that Walker was lying; (3) Walker had been awake for nearly twenty-four hours and had eaten little to nothing when he made the Post-*Miranda* Recorded Statements; and (4) Walker was visibly upset, crying, and breaking down at various points of the questioning.

3.    The Government maintains that Agent Mitchell did not use such outrageous coercive conduct that the Post-*Miranda* Recorded Statements were involuntary.  ECF No. 157, PageID #s 917-18.  The Government suggests that Walker's age, intelligence, and education were sufficient to resist the agent's questions.  The Government points to the following as establishing voluntariness: (1) the lack of threats, violence, or promises by Agent Mitchell; (2) Walker's giving of responses that were coherent, concise, and responsive to the questions; (3) the entire questioning occupied only a couple of hours (deleting times when Walker was alone in the interview room); (4) Walker received food, water, and restroom breaks; and (5)

Walker received his *Miranda* warnings and signed the waiver form. The Government also contends that Walker initiated further conversation with Agent Mitchell after invoking his right to counsel and right to remain silent, which the Government says should weigh in favor of finding that the statements were voluntary. The Government posits that Agent Mitchell only asked Walker if he wanted a lawyer to clarify whether he was invoking his right to counsel, stating that Walker lowered his voice when he responded, "Yes," to the question, "Do you want a lawyer?"

4. This court concludes that the Post-*Miranda* Recorded Statements were not the product of Walker's free and rational choice. Walker clearly did not want to answer Agent Mitchell's questions, providing evasive and cursory responses. He was very reluctant to provide Lisa Jackson's full name or to explain his connection to her, doing so only after being prodded multiple times to tell the truth and provide "his side of the story." Agent Mitchell provided Walker with lunch, but Walker did not eat much of the lunch, even though it had been hours since his last meal. He had been up a very long time, having worked overnight. His will was further weakened by his isolation from others, including legal counsel, and his detention at the CID office. As noted earlier, he had stripped down naked to change his clothes and had an agent scrape his fingernails and take his fingerprints. While these actions were

voluntary, they were surely not comfortable.  Walker had no phone with him in the interview room and, having not driven himself to the CID office, had no readily apparent way to leave.

5.    The foregoing circumstances on their own weigh against voluntariness, but it is Agent Mitchell's unrelenting accusations and aggressiveness that carry the most weight in this court's determination.

6.    First, Agent Mitchell repeatedly referred to forensic evidence linking Walker to the crime scene and implied that Walker had killed his wife.  He asked Walker why his bloody fingerprints were on the knife.  Interview Transcript at 86. After badgering and hearing Walker insist that he had not killed his wife, he ignored Walker's second invocation of his right to remain silent.  Walker's statement was unequivocal:  "I don't want to talk about this any more." *Id.*  Instead of ending his questions, Agent Mitchell escalated his accusations, saying, "That's it, you're just going to leave it hanging?  This is what's going to happen.  They're going to find forensics, and it's going to look bad, Mike.  That's it.  It's going to look bad." *Id.*

7.    Second, Agent Mitchell used religious undertones in an effort to make Walker feel vulnerable and confess.  He differentiated between good and bad and the "path of the righteous." *See id.* at 103.  He implied that Walker had

a "demon" inside of him, *see id.* at 89, but suggested that his "soul" needed to be "saved." *See id.* at 104. Agent Mitchell further suggested that God had put Walker in a situation in which he needed to confess and tell the truth. *See id.* at 89. Walker was a Mormon, and Agent Mitchell was preying on his religious beliefs.

8.    Third, Agent Mitchell repeatedly referred to what he would tell Walker's commander and what his commander would decide for Walker. He offered two choices, suggesting that Walker's commander would appreciate forthrightness. Such references were designed to coerce a soldier; at the very least, they might weaken the person's mindset and ability to resist questioning. Agent Mitchell sought to weaken Walker's resistance and his resolve to remain silent.

9.    Fourth, Agent Mitchell suggested that a confession would help, not hurt, Walker. Agent Mitchell comes dangerously close to suggesting wrongly that a confession will have no adverse legal consequence. He tells Walker that when people confess, "then we can get them the help they need." *Id.* at 101. He also says that if Walker confesses, then he "can get on with [his] life because that's what we're talking about right now" and then "we can give you a hand to take you into the right position where you need to be." *Id.* at 103. He even says, without an attempt at irony, "the truth is what sets you free."

*Id.  See Henry*, 197 F.3d at 1027 (noting that a defendant's statement was involuntary in light of a detective's assurance that the defendant's statement would not be used against him).

10.  Each time Agent Mitchell referred to forensic evidence, religious beliefs, and Walker's command during one of his long statements, Walker gave in and told Agent Mitchell something about Lisa.  Near the end of the forty-minute post-*Miranda* period, Walker anxiously cried out, raised his voice, and admitted further details about his relationships and Lisa.  At these junctures, Walker's physical and mental states reflect that his will had been completely overborne by Agent Mitchell's questioning.

11.  Agent Mitchell's refusal to honor Walker's assertion of his rights was inexcusable.  Although the Government says that Walker had lowered his voice the first time he answered, "Yes" to wanting a lawyer, the videotape demonstrates that Walker clearly and unequivocally asked for a lawyer.  Contrary to the Government's position, there was no need for Agent Mitchell to clarify whether Walker actually wanted a lawyer at that time.  Indeed, after Agent Mitchell again asked Walker if he wanted a lawyer, Agent Mitchell referred to his wife's stabbing and said, "I need to ask whether -- whether or not you know anything about it, okay?"  *Id.* at 78. Clearly, Agent Mitchell was not intent on honoring Walker's

invocation of his *Miranda* right to counsel; Agent Mitchell wanted to get more information, possibly even a confession, from Walker about his wife's murder. Agent Mitchell twice ignored Walker's statements that he did not want to talk. Although Agent Mitchell was not successful in obtaining a confession from Walker, any statements taken in violation of *Miranda* were actively compelled, not voluntary.

12. The Ninth Circuit has noted, "*Miranda* expresses concern about the compelling pressures that weigh upon a person in custody, pressures that can break a person's free will and cause that person to talk involuntarily." *Henry*, 197 F.3d at 1028 (quoting *Collazo v. Estelle*, 940 F.2d 411, 417 (9th Cir. 1991) (en banc)). Agent Mitchell acted as if Walker's invocations of his rights were of no consequence. This naturally created considerable pressure on Walker. "Any minimally trained police officer should have known such pressure was improper and likely to produce involuntary statements." *Id.*

13. The nature of the questioning, the length of the detention, and Agent Mitchell's demeanor and tone of voice, combined with Walker's lack of food and sleep and his several hours of prolonged isolation from friends, family, and other people in the interrogation room, produced involuntary statements that were not the product of an essentially free and unconstrained choice.

14.    This court acknowledges, "We are . . .
always engaged in a search for truth in a criminal case so long
as the search is surrounded with the safeguards provided by our
Constitution." *Hass*, 420 U.S. at 722.   However, when an officer
who has administered *Miranda* warnings ignores a defendant's
invocation of his constitutional right to counsel and right to
remain silent and continues interrogation for over thirty
minutes, the exclusionary rule is not deterring anything.   *See
id.* at 723.   The officer has little to lose, knowing that he may
gain impeachment material from the continued questioning.   *See
id.*   In a case like this, in which the officer's conduct amounts
to abuse, excluding the involuntary statements cannot be said to
"pervert the constitutional right into a right to falsify free
from the embarrassment of impeachment evidence from the
defendant's own mouth."   *Id.*

15.    While this court fully understands the need
to preserve the truth-seeking purpose of a trial by preventing
witnesses, including testifying defendants, from lying at trial,
this court also recognizes the need to prevent law enforcement
misconduct.   In balancing these interests, the court is once
again focused on who has the burden of proving voluntariness.
That burden lies with the Government.   Suppressing Walker's
involuntary statements for all purposes has a deterrent effect

on officers seeking to take unfair advantage of the compelling

pressures weighing on a person in custody.[4]

16.   Because the Post-*Miranda* Recorded Statements

were involuntary, they are not admissible for any purpose.   The

court suppresses those statements for any purpose, including

impeachment.

**E.   The Handwritten Note Evidence Is Also Suppressed for All Purposes.**

1.   Walker asserts that his post-lunch

handwritten notes are inadmissible because they were made after

he had invoked his *Miranda* rights and were not made to give to

---

[4]      During argument on the present motion, the Government
referred to this court's oral ruling on a motion to suppress in
*United States v. Joseph*, Crim. No. 06-00080 SOM.   This court's
ruling was affirmed by the Ninth Circuit.   *See* ECF No. 1343 in
Crim. No. 06-00080 (memorandum disposition in Appeal No. 09-
10289).   This court had ruled in that case that post-*Miranda*
statements by a defendant could be used either to impeach the
defendant if he took the stand or in the Government's rebuttal
case if made appropriate by the defense case in chief.   The
Government now urges this court to make the same ruling in this
case, allowing Walker's statement to be used to impeach him if
he takes the stand.   However, in allowing impeachment use of
post-*Miranda* statements in *Joseph,* this court was focused on
circumstances not present here.   In *Joseph,* this court found
that the defendant had received ineffective assistance of
counsel.   Ineffective assistance is not something that *Miranda*
warnings were intended to deter.   *See* ECF No. 698, PageID #s 28-
34, in Crim. No. 06-00080 SOM.   Thus, in reviewing the post-
*Miranda* statements in *Joseph,* this court did not have before it
this case's balancing of the need to deter law enforcement
misconduct against the desire to promote the truth-seeking
function of a trial.

law enforcement.  ECF No. 147-1, PageID # 818.  He says that
Agent Pezel noticed his handwritten notes and (without providing
evidence to this effect) claims that Agent Pezel "demanded that
Walker give him the notes to make a copy."  *Id.*  Walker argues,
"Just as with verbal statements elicited after an invocation of
rights, these notes must be suppressed because they were
forcibly obtained from Walker after he asserted his *Miranda*
rights to silence and the assistance of counsel."  *Id.*

2.    The Government contends that Walker's notes
are admissible because they were not made in response to Agent
Pezel's questioning and were voluntarily given to law
enforcement.  ECF No. 157, PageID # 920.  The Government
suggests that Walker "likely wrote the note with the intent of
law enforcement reading it" and "may have been prompted in part
by his desire to question law enforcement on its conclusion,
after lunch, that he was now a suspect in the murder of his
wife."  *Id.*, PageID #s 920-21.

3.    "Any statement given freely and voluntarily
without any compelling influences is . . . admissible in
evidence."  *Miranda*, 384 U.S. at 478.  "Volunteered statements
of any kind are not barred by the Fifth Amendment. . . ."  *Id.;*
*see also Pavao v. Cardwell*, 583 F.2d 1075, 1077 (9th Cir. 1978)
(observing that *Miranda* does not apply to a defendant's
volunteered statement).

4.    Walker asked Agent Pezel for a pen and paper and wrote notes to himself.  After seeing Walker's handwritten notes, Agent Pezel asked Walker if he could see them and asked if he could make a copy.  According to Agent Pezel, Walker agreed.

5.    Notably, Walker's notes appeared to respond to Agent Mitchell's earlier questioning, which the Government says ended some time before Agent Pezel gave Walker the requested pen and paper.  The Government emphasizes that Walker's notes were not in response to Agent Pezel's questions.  However, this court wonders why, after providing the requested pen and paper and leaving the room, Agent Pezel went back to the room or questioned Walker about any matter without counsel present.  Nor does this court consider the break (even assuming it went from 2:39 p.m., when Agent Mitchell's questioning stopped, until after 4:07 p.m., when the tape was turned off) sufficient to eliminate any taint from the prior *Miranda* violations.  A reasonable innocent person in Walker's position, who had just been interrogated without a lawyer, told that he was a suspect in his wife's murder, processed for DNA evidence, and kept in a small interrogation room, would have thought he needed to deflect attention from himself to prove his innocence. It is especially significant that, despite Walker's requests for counsel and invocations of his right to remain silent, no

counsel was present for Agent Pezel's questioning.  Had Walker not been compelled to make his prior statements to Agent Mitchell, he might not have felt compelled to write any notes at all.

6.    Given the totality of the circumstances, Walker's handwritten note responding to Agent Mitchell's aggressive and accusatory questioning cannot be said to have been voluntarily made, even though Walker allegedly agreed to give the note to Agent Pezel once he had written it.  The Handwritten Note Evidence is barred under the Fifth Amendment. It may not be used at trial for any purpose.

IV.        **CONCLUSION.**

The motion to suppress is granted in part and denied in part.  The court does not suppress any statement Walker made before Agent Mitchell asked him about his extramarital affairs (appearing at page 49 of the Interview Transcript).  Any statement made after that question is suppressed and may not be used at trial for any purpose.  Walker's handwritten note and any statements about the note are also suppressed and may not be used at trial for any purpose.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 3, 2017.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

*United States v. Michael Walker*, Crim. No. 15-00293 SOM-KSC-2; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS STATEMENTS BASED ON THE FOURTH AND FIFTH AMENDMENTS.